UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GREEN EDGE ENTERPRISES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:02CV566TIA |
| ) | |
| RUBBER MULCH ETC., LLC, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| AND RELATED CLAIMS ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on the Markman Hearing held on March 14, 2007 and the related Markman Briefs. The parties seek construction of claims contained in U.S. Patent No. 5,910,514 ('514 patent) for "synthetic mulch." All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I. Background**

**A. The Parties**

Green Edge Enterprises, LLC ("Green Edge") is the owner by assignment of the U.S. Patent No. 5,910,514 ('514 patent) entitled "SYNTHETIC MULCH." (Pl. Markman Brief Exh. 1) Counterclaim Defendants Lee Greenberg and Judy Smith are the inventors of said synthetic mulch. (Id.) Counterclaim Defendant International Mulch is the exclusive licensee to use the '514 patent in the continental United States, except Texas and Nebraska, in which territories International Mulch has a non-exclusive licence. Counterclaim Defendant Michael Miller is the President of International Mulch. Defendants Rubber Mulch Etc., LLC ("Rubber Mulch"), Rubber Resources Ltd. LLP ("Rubber Resources"), and GroundScape Technologies LLC ("GroundScape") also manufacture and

sell synthetic mulch.

### B. The '514 Patent

Lee Greenberg and Judy Smith filed the '514 patent on October 1, 1997. The United Staes Patent Office issued the patent on June 8, 1999. The Abstract describes the synthetic mulch as follows:

> The present invention relates to synthetic wood chips and methods for making the same. The synthetic wood chips are made from rubber particles, such as ground up tires, and a colorant which colors the rubber particles to look like natural mulch. The synthetic mulch is available in a wide variety of shapes and sizes, however, it is preferred for the synthetic mulch to look like wood chips, tree bark, or pea gravel.

(Pl. Markman Brief, Exh. 1) The '514 patent contains 8 claims which the parties contend require interpretation of numerous terms by this Court. For the sake of efficiency, the undersigned will consolidate the parties' submissions of disputed claim terms, which include:

a. "synthetic mulch"

b. "sized, shaped, and colored to imitate natural mulch"

c. "rubber selected from the group consisting of natural polymers and synthetic high polymers"

d. "natural polymers" and "synthetic high polymers"

e. "outer surface designed and dimensioned to look like natural mulch selected from the group consisting of pea gravel, wood chips, and tree bark"

f. "an amount of . . . **added**" and "adding an amount of"

g. "water based acrylic colorant" and "colorant"

h. "between about 3% and about 10% by weight of said rubber particles"

i. "rubber particles are . . . selected from the group consisting of **waste rubber buffings** and

**ground tires**"

j. "preferably selected"

k. "VISICHROME"

l. "shredding" and "shredded"

m. "size between about a quarter inch and about four inches"

n. "thoroughly mixing"

o. "method for using **vulcanized rubber**" and "shredded vulcanized rubber particles"

p. "rough bark like texture"

q. "colored textured material"

r. "outer surface that is embossed"

## II. Legal Standards

Through the process of claim construction, the Court ascertains the scope and the meaning of each claim as a matter of law. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387-388 (1996) (citations omitted). To determine the meaning of claims, this Court must consider the claims, the specification, and the prosecution history. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) (citation omitted). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The Court begins by looking "to the words of the claims themselves, . . . , to define the scope of the patented invention." Id. (citation omitted). "[W]ords in a claim are generally given their ordinary and customary meaning . . ." Id. Further, "the ordinary and customary meaning of a claim

term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (citations omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. In addition, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Id. at 1314.

"The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) (citation omitted). Further, the specification "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Id. at 1316. Further, where the specification shows an intentional disclaimer or disavowal of the scope by the inventor, that inventor's intention is dispositive. Id.

Courts should also consider the prosecution history of the patent, which "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express

representations made by the applicant regarding the scope of the claims." Vitronics Corp., 90 F.3d at 1582. Such history is relevant, as "it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean." Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (citations omitted).

In addition to relying upon intrinsic evidence in claim construction, courts may also rely on extrinsic evidence, which consists of evidence external to the patent and prosecution history and includes expert and inventor testimony, as well as dictionaries and treatises. Id. However, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. at 1319.

### III. Discussion

#### A. Markush Groups

Plaintiff Green Edge acknowledges that the patent contains three "Markush groups" in the '514 patent using the phrase "consisting of." These groups are:

1. "rubber selected from the group consisting of natural polymers and synthetic high polymers;"

2. which looks like natural mulch "selected from the group consisting of pea gravel, wood chips, and tree bark;" and

3. "rubber particles are preferably selected from the group consisting of waste rubber buffings and ground tires."

5

"A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C." Abbott Labs. v. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1280 (Fed. Cir. 2003). Further, "[i]t is well known that 'members of the Markush group are … alternatively usable for the purposes of the invention.'" Id. (quoting In re Driscoll, 562 F.2d 1245, 1249 (CCPA 1977)). "Proper claim drafting requires the Markush group to be closed; therefore, the group must be characterized with the transitional phrase 'consisting of' rather than 'comprising' or 'including.'" Maxma v. ConocoPhillips, Inc., 2005 WL 1690611 at *5 (E.D. Tex. July 19, 2005) (citation omitted). Therefore, "members of the Markush group are used singly." Abbott Labs., 334 F.3d at 1281 (quotation omitted). Moreover, "the transitional phrase 'consisting of' closes the *group of alternatives*, not the claim." Maxma, 2005 WL 1690611 at *5 (emphasis in original). In Abbot Labs., the Federal Circuit held:

> If a patentee desires mixtures or combinations of the members of the Markush group, the patentee would need to add qualifying language while drafting the claim . . . Thus, without expressly indicating the selection of multiple members of a Markush grouping, a patentee does not claim anything other than the plain reading of the closed claim language.

334 F.3d at 1281.

Plaintiff Green Edge maintains that the members contained in the Markush groups are not mutually exclusive, allowing Green Edge to select more than one alternative. Defendants, on the other hand, assert that the plain meaning of the Markush groups contained in the '514 patent limits the Markush claim element to only one of the group's members because the claim does not include qualifying language expanding the nature of the group.

The undersigned agrees with the Defendants that the Markush groups are closed and that they

6

do not contain any qualifying language which would allow mixtures or combinations. Indeed, the unpublished cases cited by Green Edge do not hold otherwise. Both <u>Maxma v. ConocoPhillips, Inc.</u>, No. Civ. A. 2:03CV421, 2005 WL 1690611 (E.D. Tex. July 19, 2005) and <u>Dow Agrosciences LLC v. Cromopton Corp.</u>, No. 1:03-CV-0654-SEB-JPG, 2004 WL 1087362 (S.D. Ind. May 12, 2004) relied on the <u>Abbott Labs.</u> case in construing the Markush groups. The <u>Maxma</u> court noted that a Markush group closes the group of alternatives, not the claim. <u>Maxma</u>, 2004 WL 1087362 at *5. Thus, the court held that, because the **claim** was open-ended, the presence of any of the alternatives in the Markush group satisfies the claim limitation "even if other structures or ingredients are also present." <u>Id.</u> The <u>Maxma</u> court further cited <u>Abbott Labs.</u> with approval, stating:

> *Abbott Laboratories* is not to the contrary. The Markush group in that case required the presence of an "amount effective of a Lewis acid inhibitor selected from a group. *Abbott Laboratories*, 334 F.3d at 1276. The patentee attempted to prove infringement by combining two Lewis acid inhibitors to prove that the combination of those substances in the accused product was an "amount effective." *Id.* at 1282-1283. The Federal Circuit noted, however, that the Markush group at issue did not permit mixtures of the individual members of the group. *Id.* at 1283. Therefore, the court concluded that the patentee, to prove literal infringement, would need to show that only one member of the group was present in an "amount effective" to meet the claim limitation. *Id.* at 1282. "Thus, the plain meaning of asserted claims 1 and 6 limits them to a single Lewis acid inhibitor selected from the recited Markush group, and present in an amount effective to prevent degradation of sevoflurane by Lewis acids." *Id.* at 1281. *Abbott Laboratories* did not hold that the presence of *any* Lewis acid inhibitor, together with an "amount effective" of a listed Lewis acid inhibitor, would defeat a claim of literal infringement.

<u>Maxma</u>, 2004 WL 1087362 at *5 (quoting <u>Abbott Labs. v. Baxter Pharm. Prods., Inc.</u>, 334 F.3d 1274 (Fed. Cir. 2003)).

Similarly, the court in <u>Dow Agrosciences</u> relied on <u>Abbott Labs.</u> to set forth the legal

7

standards for Markush groups. Dow Agrosciences LLC v. Cromopton Corp., No. 1:03-CV-0654-SEB-JPG, 2004 WL 1087362 at *7 (S.D. Ind. May 12, 2004). Specifically, the Dow Agrosciences court noted that "[i]f a patentee desires to use or to combine multiple members of the Markush group, then he or she must add qualifying language to the claim." Id. (citing Abbott Labs. v. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1281 (Fed. Cir. 2003)). In Dow Agrosciences, the patentee used the language "contains at least one substituent chosen from the group consisting of." Id. The court held that this qualifying language "modifies the word substituent, allowing the patentee to select more than one substituent from among the Markush group." Id.

Patent '514, however, contains no such qualifying language. Claims 1(a) and 8(a) contain the language "**with the rubber selected from the group consisting of natural polymers and synthetic high polymers**." Claim 1(a) also contains the language " with said rubber particles having an outer surface designed and dimensioned to look like **natural mulch selected from the group consisting of pea gravel, wood chips, and tree bark** . . ." The language of Claims 2 and 6 reads, "**said rubber particles are preferably selected from the group consisting of waste rubber buffings and ground tires**." (Pl. Exh. 1) (emphasis added). Like the patent in Abbott Labs., "the claims do not clearly embrace more than one member of the Markush group." Abbott Labs., 334 F.3d at 1281. Therefore, the plain meaning of the claims asserted in 1, 2, 6 and 8 "limits them to a single [alternative] selected from the recited Markush group." Id.

**B.  The Disputed Terms**

Defendants cite several terms in the 8 Claims of the '514 Patent that they contend requires construction by this Court. The Court will discuss each term separately. However, the Court must consistently interpret the same term in all claims. Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d

8

1570, 1579 (Fed. Cir. 1995) (citation omitted). "Accordingly, arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." Id.

   a. "synthetic mulch" Claims 1-5

Upon consideration of the parties' proposed construction, the undersigned sets forth the following definition for "synthetic mulch:" "a manufactured material for placement on the ground, which is designed, dimensioned and colored to have an appearance enabling it to substitute for hay, wood chips, tree bark, rocks, pea gravel, leaves, and other similar natural plant and mineral materials usable as groundcover." ('514 Patent, col. 1, lns. 4-31)

   b. "sized, shaped, and colored to imitate natural mulch" Claims 1, 4, and 5

During the hearing, counsel for Green Edge stated that it did not have a problem with the first part of GroundScape's definition. However, Green Edge further stated that "any other natural plant or mineral material usable as ground cover" was too broad in that it would encompass bushes, ivy, and other ground cover that were not mulch. (Markman Hearing Transcript, p. 50) The undersigned agrees. Therefore, the Court defines "sized, shaped, and colored to imitate natural mulch" as "having an appearance enabling it to substitute for hay, wood chips, tree bark, rocks, pea gravel, leaves, and other similar natural plant and mineral materials."

   c. "rubber selected from the group consisting of natural polymers and synthetic high polymers" Claims 1 and 8

As stated above, this phrase is a Markush group, limited to a single alternative. With regard to its definition, the Court finds that "rubber selected from the group consisting of natural polymers and synthetic high polymers" is "the rubber constituent of the particles consists solely of either natural

9

polymers (such as natural rubber) or synthetic high polymers (synthetic polymers of the type used in the production of vehicle tires)."

### d. "natural polymers" and "synthetic high polymers"   Claims 1 and 8

As stated above, "natural polymers" are natural rubbers. "Synthetic high polymers" are synthetic polymers of the type used in the production of vehicle tires. Contrary to Green Edge's argument, the Court finds it unnecessary to use extrinsic evidence to define these terms. The specification notes that high polymers include "rubber buffings or ground rubber from truck retreads. Other rubber materials suitable for use in forming the synthetic mulch include ground automobile tires and truck tires." ('514 Patent, col. 4, lns. 22-25)

### e. "outer surface designed and dimensioned to look like natural mulch selected from the group consisting of pea gravel, wood chips, and tree bark"   Claim 1

These terms are a Markush group, as stated above. After consideration of each party's proposed definition, the undersigned finds that this phrase should be defined as "having the size and outer surface texture of pea gravel (a smooth surface with a few rough edges, as in figure 2), wood chips (a surface with only a few ridges), or tree bark (a rough surface with numerous ridges and valleys of differing heights and depths, as in figure 1), but not a combination of any of the three. ('514 Patent, col. 3, lns. 50-62)

### f. "an amount of . . . added" & "adding an amount of"   Claims 1, 4, and 8

The terms "added" and "adding" should be given their plain and ordinary meaning in this instance. While Rubber Mulch proffers a definition of "joining or uniting without mixing," the patent specification does not support its argument. The detailed description states, in part, "[af]ter the rubber particles are placed in the mixing means an amount of colorant is added to the rubber particles

in the mixing means." ('514 Patent, col. 4, lns. 31-33) Nothing in the claims, specification or patent history supports the definition that the colorant is added without mixing. Therefore, the undersigned finds that the terms "added" and "adding" mean "to join or unite so as to bring about an increase or improvement." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/add>.

### g. "water based acrylic colorant" and "colorant" Claims 1,3, 4, 5, 7, and 8

The term "water based acrylic colorant" is defined as "a water-based substance having both a pigment and an acrylic component." This definition comes from the patent itself, which specifies that "[t]he colorant used to color the rubber particles, shreds, granules, and/or chips can be selected from a variety of different coloring systems, as long as the colorant is available in at least earth tone colors, readily adheres to rubber, and does not wash off the rubber when contacted by water." ('514 Patent, col. 4, ln. 66 through col. 5, ln. 3) The term "colorant" means "a substance used for coloring a material: dye, pigment." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/colorant>. While Defendants Rubber Mulch and Rubber Resources maintain that such colorant cannot have a binding agent, inherent in the coloring process is the fact that the colorant adheres to the rubber to form a coating. Thus, the Court will not adopt Rubber Mulch's definition that the colorant does not contain a binder.

### h. "between about 3% and about 10% by weight of said rubber particles" Claims 1 and 8

Defendant GroundScape contends that this phrase means "no less than 3% and no more than 10%." Plaintiff Green Edge, on the other hand, maintains that the terms "about" mean "approximately," allowing said percentages to include volumes not literally within the specifically identified percentages, but those which are close. The undersigned agrees with Green Edge that the

11

language in the claims does not limit Green Edge to a hard minimum or hard maximum. According to the Merriam-Webster Online Dictionary, the word "about" means "reasonably close to." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/about>. In this case, therefore, the Court will construe "between about 3% and about 10%" as "an amount equal to between [reasonably close to] 3% and [reasonably close to] 10%." Indeed, the patent itself mentions that "[t]he amount of colorant added to the stainless steel bucket was equal to one (1) cup or 2.5% by volume of the rubber particles." ('514 Patent, col. 5, lns. 40-42) There is no justification for using extrinsic, deposition testimony to construct these terms. Whether the amount that GroundScape uses falls within this definition is a determination for the jury.

> i. "rubber particles are . . . selected from the group consisting of **waste rubber buffings** and **ground tires**" Claims 2 and 6

As stated previously, this is a closed Markush group, limiting the rubber particles to either "waste rubber buffings" or "ground tires" but not both. With regard to the definition of "waste rubber buffings," Green Edge does not offer any definitions for these terms, but claims that, although the patent describes the processes used in grinding and buffing, it does not make the processes part of the claimed invention. Further, the patent does not limit the type or size of rubber particle. However, the undersigned finds that these alternative terms require definitions. Therefore, the Court will adopt the well-reasoned definitions proffered by GroundScape. "Waste rubber buffings" are "a product obtained from a tire re-treading process in which tread is removed from the used tire body by a buffing device," and "ground tires" are "the product of a tire recycling process in which the entire body is reduced to pieces by grinding or shredding." (Moy Decl. Exh H ) Indeed, Green Edge acknowledged this during the Markman hearing by agreeing with the Court that "[b]uffing is the

12

retread, and ground tires is the full tires." (Hearing Transcript, p. 8)  These definitions do not restrict the size or shape of the rubber particles; however, they give plain and ordinary meaning to the alternatives contained in the closed Markush group.

j.  "preferably selected" in Claims 2 and 6

The Court finds that the term "preferably" is defined as "having greater value or desirability." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/preferable>.  Both GroundScape and Green Edge submitted similar proposed definitions; however, GroundScape has provided no support for including the terms "not exclusively or necessarily" in the definition.

k.  "VISICHROME" in Claim 3

The patent itself defines "VISICHROME" as a "colorant system[ ] sold under the name 'VISICHROME', by Futura Coatings, Inc. of Hazelwood, Mo." ('514 Patent, col. 5, lns. 5-7) As stated by the Plaintiff, Futura worked with Green Edge to develop a coating to color rubber mulch.  Once developed, Futura held the formulation of VISICHROME as proprietary and did not disclose said formula.  Thus, the Court defines "VISICHROME" as "a water-based acrylic colorant system used to color rubber particles."

l.  "shredding" and "shredded  Claims 4 and 5

With regard to these terms, Green Edge simply states that the Court should give the terms their plain and ordinary meaning.  According to the patent, the rubber particles are "cut . . . to resemble tree bark . . . , wood chips, pea gravel . . . , and a variety of other natural mulches, as the rubber particles can be textured in a variety of ways." ('514 Patent, col. 3, lns. 50-54) According to the Merriam-Webster Online Dictionary, "shredded" or "shredding" means, "to cut or tear into

13

shreds." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/shred>. Therefore, the Court finds that the terms "shredded" or "shredding" are defined in the '514 Patent as, "to cut or tear into pieces to resemble tree bark, wood chips, pea gravel and other natural mulches."

### m. "size between about a quarter inch and about four inches" Claim 4

Green Edge again requests that the Court give this phrase its plain and ordinary meaning. However, the specification that Green Edge relies upon provides for "round rubber particles [that] have a length ranging between about 1/16 inches and about eight (8) inches and a width ranging between about 1/16 inches and about two (2) inches." ('514 Patent, col. 4, lns. 7-10) The patent continues to state that "[a] variety of sizes can be used, however, dependent upon the specific natural mulch it is desired to imitate." ('514 Patent, col. 4, lns. 10-11) The term "size" is defined as "physical magnitude, extent, or bulk; relative or proportionate dimensions." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/size>. Therefore, the Court interprets "size between about a quarter inch and about four inches" to mean rubber particles ranging in "proportionate dimensions reasonably close to a quarter of an inch to reasonably close to four inches."

### n. "thoroughly mixing" Claim 4

The '514 Patent provides that "the colorant and rubber particles are thoroughly mixed so as to ensure that the particles are fully coated with the colorant and so that the synthetic mulch will be uniformly colored." ('514 Patent, col. 4, lns. 43-46) The undersigned finds that the patent thus provides the plain and ordinary meaning of "thoroughly mixing."

### o. "method for using **vulcanized rubber**" and "shredded vulcanized rubber particles"

14

Claim 5

The Merriam-Webster Online Dictionary defines "method" as "a way, technique, or process of or for doing something." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/method>. The term "vulcanization" means "the process of treating crude or synthetic rubber . . . to give it useful properties." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/vulcanization>. Therefore, the Court defines "method for using vulcanized rubber" as "the process of treating crude or synthetic rubber . . . to give it useful properties."

p. "rough bark like texture" Claim 5

Figure 1 in the '514 Patent illustrates an example of a rough bark like texture. The Patent describes said texture as a surface with "numerous ridges and valleys of differing heights and depths." ('514 Patent, col. 3, lns. 58-59) The Court finds that this definition adequately construes the phrase "rough bark like texture."

q. "colored textured material" Claim 8

The term "colored" means "having color." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/colored>. "Color" is defined as "a specific combination of hue, saturation, and lightness or brightness." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/color>. The Patent describes the color as one "desirable to the user." ('514 Patent, col. 5, ln. 22) In addition, the Merriam-Webster Online Dictionary defines "texture" as "the visual or tactile surface characteristics and appearance of something." *Merriam-Webster Online Dictionary* (visited May 15, 2007) <http://www.m-w.com/dictionary/texture>. The Patent provides for a variety of surface textures, including "smooth with a few edges similar to pea

gravel, . . . , or rough like tree bark, . . . , so that the surface has numerous ridges and valleys of differing heights and depths. Additionally, the texture can have only a few ridges on the surface texture resulting in a rubber particle having a surface similar to a wood chip." ('514 Patent, col. 3, lns. 56-62) The Patent also calls for "a variety of other natural mulches." ('514 Patent, col. 3, lns. 52-53) Thus, the undersigned construes the term "colored textured material" as "rubber particles with a specific combination of hue, saturation, and lightness or brightness that has the visual or tactile surface characteristics and appearance of pea gravel, tree bark, wood chips, and other natural mulches."

### r. "outer surface that is embossed" Claim 8

According to the '514 Patent, "the surface of the rubber materials is embossed, so that the surface will have ridges and valleys which will give the materials a rough feel." ('514 Patent, col. 2, lns. 19-20) While Green Edge provides a different definition from a dictionary, it is unnecessary to go beyond the intrinsic evidence of the Patent itself. Thus, the Court finds that "outer surface that is embossed" means "the outside surface with ridges and valleys which will give the materials a rough feel."

### **C. Conclusion**

After consideration of the parties' briefs, along with the intrinsic and extrinsic evidence, the Court adopts the interpretation of the scope and meaning of each disputed term in the '514 Patent as set forth in the body of this Memorandum and Order. The Court is aware of the motions still

16

pending. Therefore, the parties shall notify the Court, in writing, within ten (10) days how they wish to proceed on the pending motions.

**IT IS SO ORDERED.**

                                               /s/ Terry I. Adelman
                                         UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of May, 2007.